Jelindo A. Tiberti and Marietta Tiberti v. Commissioner.
Tiberti v. Commissioner
Docket No. 89138.
United States Tax Court
T.C. Memo 1962-174; 1962 Tax Ct. Memo LEXIS 133; 21 T.C.M. (CCH) 961; T.C.M. (RIA) 62174; July 25, 1962
*133 Petitioner J. A. Tiberti owned and operated as a sole proprietorship a general construction business. He and his wife created four trusts for their minor children, to each of which one-fifth of the assets of the business was contributed. A partnership was created, with Tiberti as the managing partner and two contrustees as partners representing the four trusts. All of the business assets were contributed to this partnership. Held, the transfers in trust were bona fide and each of the trusts owned a one-fifth capital interest in a bona fide partnership in which capital was a material income-producing factor. The distributable shares of partnership income were properly includible in the gross income of the trusts. Mark Townsend, Esq., for the petitioners. Walter S. Weiss, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income taxes for the years and in the amounts which follow: Year
Deficiency
1955
$46,705.91
1956
16,474.15
1957
75,491.32
The sole question for our determination is whether trusts created by petitioners for their minor children owned capital interests in a bona fide partnership in which capital was *134 a material income-producing factor so that distributable shares of partnership income were properly includible in the gross income of each of four trusts. Findings of Fact The parties have stipulated certain facts. The stipulated facts, together with the exhibits, are incorporated herein by this reference. The petitioners are Jelindo A. Tiberti and Marietta Tiberti, husband and wife. Their residence was Las Vegas, Nevada, and they filed a joint income tax return with the district director of internal revenue at Reno for each of the years here involved. (For convenience, Jelindo A. Tiberti will sometimes hereinafter be referred to as petitioner or as Tiberti.) Petitioner, who is a registered engineer in the State of Nevada, formed the J. A. Tiberti Construction Company in 1950 and operated it as a sole proprietorship through 1954. (The sole proprietorship and the partnership are hereinafter sometimes referred to as the company.) The company engaged in the heavy construction business. Before establishing his own business Tiberti had worked as an employee or associate in other general contracting firms. Tiberti, whose parents were born in Italy, comes from a family of nine children. While *135 they were still in high school, petitioner and his brothers were taken into the family business by their father, who operated a gas station under the name Tiberti & Sons. In 1954 petitioner had four children: John Tito, Laura Lisa, Mary Andrea, and Renaldo Milan, whose ages as of January 1, 1955, were 9, 7, 5, and 3, respectively. Over a period of time, Tiberti and his wife discussed taking the four children into petitioner's business. Both the partnership and corporate forms of doing business were considered; but, upon the advice of his attorney, Tiberti ultimately decided to utilize the former. In late 1954, at a meeting of petitioner, his attorney, E. W. Cragin, and Don R. Beagle, it was agreed that a trust would be created for the benefit of each of petitioner's four children. The res of each trust was to consist of a one-fifth interest in the assets and liabilities of Tiberti's construction business. It was planned that each of the four trusts and the petitioner would exchange an undivided interest in the assets and liabilities for a one-fifth interest in a partnership which would thereafter operate the business. Cragin and Beagle consented to serve as cotrustees for each of *136 the four trusts and to form a partnership to take effect on January 1, 1955. Petitioner's attorney was requested to prepare the formal documents evidencing these agreements. Four trust instruments, identical save for the designated beneficiary, were executed in the spring of 1955. They provided as follows: TRUST AGREEMENT TRUST AGREEMENT made January 1, 1955, among J. A. Tiberti and Marietta Tiberti, residing in Las Vegas, Nevada, as Grantors and Don R. Beagle and E. W. Cragin, as Trustees. 1. GRANT. The Grantors hereby irrevocably assign to the Trustees in trust an undivided one fifth interest in certain assets subject to certain liabilities as more fully described in a schedule annexed hereto as Schedule A and made a part hereof, all of which property is hereinafter termed the trust property; and the Grantors direct that the trust property be contributed to a partnership organized this day in accordance with the copy of a partnership agreement attached hereto, and that the Trustees continue their interest in that partnership until the termination of this trust or of their interest in that partnership in accordance with the terms of the partnership agreement; and that the Trustees *137 shall not be accountable for any diminution of the trust property by reason of their compliance with these directions. 2. BENEFICIARY. The trust property shall be held as a trust fund for the benefit of the Grantors' * * * [son or daughter designated by name], hereinafter called the beneficiary. 3. DISCRETIONARY PAYMENTS. The income of the trust shall be accumulated; provided, however, that the Trustees may, in their absolute discretion pay to or apply for the beneficiary so much of the current or accumulated income or the corpus of the trust as they shall determine. The Trustees are further authorized, when in their sole absolute discretion they may deem it advisable, to make such payments of income or corpus directly to the beneficiary, or to any person with whom the beneficiary shall reside, or to any person, partnership, or corporation furnishing services, goods or facilities to the beneficiary at the request of the Trustees or otherwise. 4. RETENTION OF BUSINESS EARNINGS. (a) Notwithstanding the right to beneficial enjoyment of trust property generally accorded to an income beneficiary of a trust under the general principles of the law of trusts, or the purport of any other *138 rules affecting, inter alia, the administration of trusts, or the rights of beneficiaries of trusts, or the duties of trustees, so long as the assets of the trust are at any time invested in any business or businesses, whether sole proprietorship, partnership, or corporation and it is decided from time to time by the managers, working partners, or proprietors of any such business (whether or not such managers, working partners, or proprietors include or consist of any of the trustees of this trust) that it is in the best interests of the business to retain earnings for working capital needs, or for legitimate business purposes connected with the protection or expansion of the earning capacity of the business, then and in that event, the earnings shall not be required to be distributed to the trust until such time as it is decided by the managers, working partners, or proprietors of the business that the retention of any such earnings is no longer necessary or helpful to the business. The decisions as to the retention of earnings in any business shall be in the absolute discretion of the managers, working partners, or proprietors thereof and shall be binding on all parties in interest *139 hereunder; and the trustees shall abide by any such decision so long as they deem it in the best interest of the trust, as a proprietor of such business, to do so. In the event any conflict arises between the duties imposed by law upon the Trustees in their capacities as Trustees, and the duties imposed by law or otherwise upon the Trustees in their capacities as Managers of the business, the latter shall control. The Trustees shall not be held accountable in any way for decisions or actions taken in good faith in furtherance of the Grantors' intentions as expressed in or implied by this paragraph; nor shall any of the Trustees be held responsible to the beneficiaries or to any persons beneficially interested in the trust for any loss in income or to the corpus thereof unless the same shall occur through his own gross neglect or wilful malfeasance. (b) For the purposes of the Trustees' exercise of their discretionary power of distributing trust income under paragraph 3 hereof, the earnings of any business which have been retained pursuant to the terms of sub-paragraph (a) of this paragraph shall not be deemed to be income of the trust until such time as the earnings of the business *140 are released to the Trustees. 5. TERMINATION OF TRUST. The trust shall terminate upon the death of John Tito Tiberti, and the principal and any undistributed and accumulated income shall be paid over absolutely to his issue per stirpes, or, if there be none, to Renaldo Milan Tiberti, Mary Andrea Tiberti, and Laura Lisa Tiberti, son and daughters of the Grantors herein, as joint tenants, and to the survivors of them. 6. ADDITIONAL GRANTS. The Grantors reserve the right to themselves or to any person at any time by deed or will to add to the principal of the trust herein created and any property so added shall be held, administered, and distributed as part of such trust. 7. POWERS OF FIDUCIARIES. In the administration of the trust, the Trustees shall have the following powers: (a) They may retain the trust property received hereunder and any additional property which may be received by them in their adsolute [absolute] discretion even though such property is not income producing property and may invest and reinvest the trust in such real or personal property of any kind or description as they in their absolute discretion may deem proper, although the same may not be of the character *141 permitted for the investment of trust funds by the laws of the State of Nevada or of any state in which such property may be situate, and not with standing that the same may constitute leaseholds, royalty interests, patents, interest in mines, oil and gas wells, timber lands or other wasing [washing] assets, or business interests as more fully described in sub-paragraph (j) of this paragraph. (b) With regard to any real, or other property at any time constituting a part of the trust, they may whenever they deem it in the best of interest of the trust: 1. Make, renew, or modify leases on any such property upon such terms as they may determine, irrespective of the provisions of any statute or of the termination of any trust: 2. Mortgage any such property on such conditions as they may determine, and extend, modify, or consolidate any such mortgages; 3. Make repairs and improvements at any time deemed necessary and proper on any such property; 4. Sell any such property or any interest therein, or exchange the same for other property, on such terms as they may determine, and execute and deliver any deed or deeds (with or without warranty,) receipts, releases, contracts, or other instruments *142 necessary in connection therewith. (c) They may vote, personally or by proxy, all securities belonging to the trust, or may consent to the reorganization, consolidation, merger, liquidation, readjustment of or other change in any corporation, company, partnership, or association, or to the sale or lease of the property thereof or any part thereof; and may do any act or exercise any power with reference thereto that may be legally exercised by any person owning similar property in his own right, including the exercise of options, deposit, or exchange of securities, entrance into voting trusts, and the making of agreements or subscriptions. Any securities or other property belonging to the trust may be registered in the Trustees' own names without qualification or description, or in their names as Trustees, or in the name of the trust, or in the name of any nominee, or may be kept in bearer form. (d) They may enforce, by suit or otherwise, compromise, settle, arbitrate, or defend any debt, claim, lien, or demand in favor of or against the trust. (e) They may incur and pay the ordinary and necessary expenses of administration, including (but not by way of limitation) reasonable attorney's *143 fees, accountants' fees, investment counsel fees, and the like. (f) They may borrow money for any purposes of the trust upon bond or promissory note, and secure the repayment thereof by mortgaging or pledging or otherwise encumbering any part or all of the property of the trust, and, with respect to the purchase or other acquisition of any property, as part of the consideration given thereof, assume a liability of the transfer or acquire such property subject to a liability. (g) They may lend money to any person or persons upon such terms, and in such ways, and with such security as they may deem advisable and for the best interest of the trust. (h) They may determine in their discretion the allocation of receipts between corpus and income except that all capital gains and extraordinary and stock dividends shall be corpus. (i) With regard to any necessary and proper debts, assessments, charges and other expenses in connection with the administration of the trust, they may: (1) Pay out of any money belonging to the trust, any such expenses; (2) Determine the apportionment of such expenses between corpus and income; (3) Determine whether to make any provision for depreciation in respect *144 of any tangible property. If the expenses of any period apportioned to income exceed the income for such period, or the undistributed income for any prior period, they may charge such excess proportionately against the earliest net income of the trust thereafter realized. (j) Except as limited by the provisions of paragraph 1 above they may engage in business or businesses with the property of the trust as sole proprietor, or as a general or limited partner or as a minority or majority stockholder of a closed corporation, with all the power customarily exercised by an individual so engaged in business, and may hold an undivided interest in any property as tenant in common or tenant in partnership and in connection therewith they shall have the power to enter into agreements with co-owners, partners, or co-stockholders, and into modifications of any such agreements. (k) They may make any division or distribution of corpus or income required under the terms of this instrument in kind or in money, or partly in kind and partly in money. (l) They may freely act under all or any of the powers by this instrument given to them notwithstanding that they may also be acting individually, or *145 as Trustees of other trusts, or as agents for other persons or corporations interested in the same matters, or as stockholders, directors, or otherwise. The powers herein granted to the Trustees shall be deemed to be supplementary to and not exclusive of the general powers of Trustees pursuant to law, and shall include all powers necessary to carry the same into effect. 8. IRREVOCABILITY. The trust shall be irrevocable and shall not be amendable except for the purpose of clarification by the Grantors; and the Grantors hereby expressly acknowledge that they shall have no right or power, whether alone or in conjunction with others, and in whatever capacity, to alter, amend (except for purposes of clarification), revoke, or terminate the trust, or any of the terms of this instrument, in whole or in part, or to designate the persons who shall possess or enjoy the trust property, or the income therefrom. By this instrument the Grantors intend to and do hereby relinquish absolutely and forever all possession or enjoyment of, or right to the income from, the trust property, whether directly, indirectly, or constructively, and every interest of any nature, present or future in the trust *146 property. 9. CONSTRUCTION. It is intended that, insofar as permitted under the rules of private international law, the construction of this instrument, the validity of the interest created hereby, and the administration of the trust property will be governed by the laws of the State of Nevada. 10. DESIGNATION OF FIDUCIARIES. The Trustees shall be Don R. Beagle and E. W. Cragin, or the survivor of them. In case of the death, resignation, or inability of any Trustee, the District Judge of Department N. 1 of the Eight Judicial Court, District Court of the State of Nevada in and for the County of Clark, shall appoint a successor Co-Trustee. None of the Trustees shall be required to furnish bond for the performance of the duties of Trustee. The expression "Trustee" as used in this instrument shall mean and include the persons named as such herein and any substitute or successor Trustee named in accordance with the provisions of this paragraph. 11. ACCOUNTING. Notwithstanding the provision of any statute to the contrary, the Trustees shall not be required to render a formal accounting of the trust in any court. They shall annually prepare a true statement of the corpus and of the income *147 and expenditures of the trust and shall furnish the beneficiary with a copy of the same. Such annual accounts of the Trustees shall be binding upon the beneficiary of the trust and upon any other person or persons beneficially interested therein unless within thirty days after receiving such annual account the beneficiary or such other person shall submit a disapproval in writing to the Trustees. 12. TRUSTEES' COMPENSATION. The Trustees shall be entitled to receive for their joint compensation 1% of the gross income of said trust estate during each fiscal year, and in no case less than $25.00 each, per annum, and upon the termination of said trust, otherwise than by resignation or death of the trustees, a sum equal to 1% of the corpus of the trust estate at the date of such termination, which several payments shall be in full payment for all services rendered by the Trustees. IN WITNESS WHEREOF, the parties hereto have signed and sealed this agreement. /s/ J. A. Tiberti J. A. Tiberti, as Grantor /s/ Marietta Tiberti Marietta Tiberti, as Grantor /s/ Don R. Beagle Don R. Beagle, as Trustee /s/ E. W. Cragin E. W. Cragin, as Trustee Also executed in the spring of 1955 was a partnership *148 agreement which provided as follows: PARTNERSHIP AGREEMENT AGREEMENT made January 1, 1955, among Jelindo A. Tiberti, being hereinafter sometimes referred to as the individual party, and Don R. Beagle, and E. W. Cragin, as Trustees of the John Tito Tiberti Trust, Renaldo Milan Tiberti Trust, Mary Andrea Tiberti Trust, and of the Laura Lisa Tiberti Trust, hereinafter sometimes referred to as the fiduciary parties. Whereas the fiduciary parties are the trustees of four trusts the corpus of each trust consisting of an undivided interest in certain assets subject to certain liabilities referred to in Schedule A annexed hereto, and Whereas the individual party owns the entire remaining undivided interest in the assets subject to liabilities referred to in Schedule A, and Whereas the individual party desires to form a partnership with the fiduciary parties to engage in the general building contracting business, it is therefore agreed: 1. FORMATION OF PARTNERSHIP. The parties hereby form a partnership under the firm name of J. A. Tiberti Construction Company in which the individual and fiduciary parties are partners, to engage in the business of general building construction, rental of equipment, *149 selling of fence and other legitimate enterprises. 2. TERM. The partnership shall begin business January 1, 1955, and shall continue until December 31, 1955, and thereafter from year to year until terminated as hereinafter provided. 3. PRINCIPAL OFFICE. The principal place of business of the partnership shall be located at Las Vegas, Nevada. Such other offices shall be maintained as the partners may, from time to time, find necessary or desirable. 4. ORIGINAL CAPITAL. The original capital of the partnership shall consist of certain assets, subject to liabilities, as are now fully described in the schedule to be annexed hereto as Schedule A, and to form a part hereof at values set forth therein, in which the partners own undivided interest in the same proportions as set forth in paragraph 5. 5. CAPITAL ACCOUNTS AND PROFITS. The initial capital accounts of each partner shall equal the proportion of the original capital of the partnership set forth opposite his/her name below, and all net profits and net losses of the partnership shall be divided in the same proportions, to wit: J. A. Tiberti
one-fifth
Don R. Beagle and E. W.
Cragin, Trustees of the
John Tito Tiberti Trust
one-fifth
Don R. Beagle and E. W.
Cragin Trustees of the
Renaldo Milan Tiberti Trust
one-fifth
Don R. Beagle and E. W.
Cragin Trustees of the
Mary Andrea Tiberti Trust
one-fifth
Don R. Beagle and E. W.
Cragin Trustees of the
Laura Lisa Tiberti Trust
one-fifth
*150 6. WORKING PARTNER. J. A. Tiberti shall be the working partner and shall draw an annual salary in the amount of $15,000.00. This salary shall be treated as an expense in determining the net profits or net losses of the partnership. 7. MANAGEMENT. The partners shall have equal rights in the management and conduct of the partnership business. 8. WITHDRAWAL OF PROFITS. At the end of each accounting year of the partnership and at such other times during the year as the partners shall mutually determine, the partners shall have the right to withdraw their shares of partnership net profits for the year. All withdrawals of profits shall be made in the ratio of the partners' capital accounts as set forth in paragraph 5. It is agreed, however, that profits will not be withdrawn when to do so would be contrary to the best interest of the partnership business in the opinion of the working partner. 9. BOOKS. The books of the partnership shall be maintained at the principal office and shall be kept on such accounting basis as the partners may determine from time to time.
10. TERMINATION OF TRUST. The termination of one of the trusts participating as a partner in this partnership shall not terminate *151 or dissolve the partnership but the interest of the trust in the partnership shall abate by reason of such termination; and the trust shall be deemed to have withdrawn from the partnership as of the end of the month in which such termination occurs pursuant to the provisions of paragraph 11 hereof, except that the 90 day notice and waiting period provided in such paragraph shall not apply. The partnership shall continue to carry on the business therefore conducted by it and the fractional interests of the remaining partners in the partnership net profits and net losses shall be adjusted proportionately. 11. WITHDRAWAL. Any partner shall have the right to withdraw from the partnership at any time upon giving 90 days' notice in writing to the other partners. In such event the partnership shall be dissolved and liquidated of notice in writing of the election to dissolve is given to the other partners within such period by partners who in the aggregate would be entitled to one-half or more of the partnership net profits if the partnership were to continue after the withdrawal of such partner. If there shall be no election to dissolve, the withdrawing partner shall receive from the partnership *152 the value of his or its capital account as of the end of the month in which the 90 day period elapses. The value of capital accounts shall be taken from the partnership books of account, without allowance for good will, trade names, patents, or other intangible assets, except for costs, incurred by the partnership in the acquisition of such intangible assets as are reflected on the partnership books of account, and for the purpose of this paragraph the books of account shall be conclusive on all parties. 12. DEATH OF PARTNER. (A) On the death of a partner the partnership shall not be terminated or dissolved not-withstanding any provision of law to the contrary, and the interest of the decedent in the partnership shall not abate by reason of his death. The partnership shall continue to carry on the business theretofore conducted by it and the decedent's estate shall continue to share in the partnership profits and losses equally with the surviving partners. The estate of the decedent shall have no right by reason of the death of the decedent to demand any part of the current earnings other than by way of drawing account, or any part of the decedent's capital account except as provided *153 in sub-paragraph (b). (b) In case of the death of a partner the surviving partners shall have the right to redeem the interest of the estate of the decedent at any time at the value provided in paragraph 11, and the estate of the decedent may withdraw from the partnership at any time on the terms provided in paragraph 11. 13. PAYMENT FOR PARTNERSHIP INTEREST. In the event of the redemption of a partner's interest in the partnership pursuant to paragraph 10, 11, or 12, the redemption price shall be paid in cash without interest in four semiannual installments commencing on a date 90 days after the date hereinabove fixed for the valuation of the capital account of the withdrawing or deceased partner. 14. TERMINATION. Except as hereinabove otherwise provided, the partnership shall continue from year to year; provided, however, that the partnership may be dissolved and terminated at the end of any accounting year at the election of partners who, in the aggregate, are entitled to at least 51% of the partnership profits, or at any other time upon the mutual consent of all the partners. 15. BENEFIT. This agreement shall be binding upon and inure to the benefit of the partners and their legal *154 representatives, successors, and assigns. IN WITNESS WHEREOF, the parties hereto have signed and sealed this agreement. /s/ J. A. Tiberti / J. A. Tiberti /s/ Don R. Beagle / Don R. Beagle As Trustee of the John Tito Tiberti Trust, Renaldo Milan Tiberti Trust, Mary Andrea Tiberti Trust, Laura Lisa Tiberti Trust. /s/ E. W. Cragin / E. W. Cragin As Trustee of the John Tito Tiberti Trust, Renaldo Milan Tiberti Trust, Mary Andrea Tiberti Trust, Laura Lisa Tiberti Trust. The following schedule was attached to each of the trust instruments and to the partnership agreement: ASSETS
Current Assets
Cash in bank
$56,928.47
Loans receivable
3,445.38
Work in process - net
9,076.02
Total Current Assets
$ 69,449.87
Other Assets
Partnership interest - Nevada Perlite Co.
5,000.00
Land Fifth Street
2,053.55
Common stock - Waale, Camplan & Tiberti
3,480.00
Total Other Assets
10,533.55
Reserves for
Net
Fixed Assets
Cost
Depreciation
Value
Land
$ 7,512.20
$ 7,512.20
Buildings
48,930.72
$ 3,919.58
45,011.14
Equipment and trucks
7,843.87
4,909.56
2,934.31
Office furniture and fixtures
1,524.45
661.35
863.10
Automobile
2,100.00
1,050.00
1,050.00
Totals
$67,911.24
$10,540.49
57,370.75
Total Assets
$137,354.17
LIABILITIES AND CAPITAL
Current Liabilities
Federal withholding taxes
$ 1,253.00
Social Security taxes
96.58
Bank overdraft - payroll
1,661.40
Total Current Liabilities
$ 3,010.98
Other Liabilities
Due Partner, J. A. Tiberti
29,343.19 *
Capital
J. A. Tiberti
$21,000.00
Don R. Beagle & E. W. Cragin, Trustees for John Tito Tiberti
21,000.00
Don R. Beagle & E. W. Cragin, Trustees for Renaldo Milan
Tiberti
21,000.00
Don R. Beagle & E. W. Cragin, Trustees for Mary Andrea Tiberti
21,000.00
Don R. Beagle & E. W. Cragin, Trustees for Laura Lisa Tiberti
21,000.00
Total Capital
$105,000.00
Total Liabilities and Capital
$137,354.17
*155 Balance sheets submitted to the Royal Indemnity Company, sometimes hereinafter referred to as Royal, which company provided bonding for J. A. Tiberti Construction Company, reflected net worths of the sole proprietorship as follows: 6/30/51
4/1/51
9/1/52
2/1/53
1/1/54
7/31/54
$81,641
$101,074
$160,628
$185,407
$203,745
$247,181 These balance sheets were prepared on a percentage-of-completion basis. They reflect accrued items and estimated and contingent assets, which items and assets are not normally reflected as assets on the books of a business reporting income either on the cash receipts and disbursements basis or on the completed-contract basis. Such balance sheets normally reflect personal assets as well as business assets, listed for credit purposes at their estimated fair market value. Prior to 1953 the construction company used a cash receipts and disbursements method of reporting income. Beginning with the year 1953 the company changed to the completed-contract method. The statement of assets and liabilities supplied to Royal for sole proprietorship as of December 30, 1954, indicated total assets of $358,091.14 and total current liabilities *156 of $76,955, resulting in a net worth of $281,136.14. The statement of assets and liabilities supplied to Royal as of April 1, 1955, indicated total assets of $421,126.63 and total current liabilities of $126,829.97, resulting in a net worth of $294,296.66. Financial statements were filed with Royal for the periods ending December 31, 1955, December 31, 1956, June 30, 1957, December 31, 1958, June 30, 1959, December 31, 1959, and December 31, 1960. Upon formation of the partnership, Tiberti and his wife retained personal assets consisting of the family residence, personal life insurance, and a small homestead property. They conveyed undivided interests in the remaining assets and liabilities of the business to the extent of four-fifths thereof to the trusts. Legal title to the company's office building was not formally conveyed to the partnership. Upon sale of that property in 1957, however, the proceeds were received by the partnership; the gain was reflected on the partnership return and the individual returns of the partners; and the gain was credited equally to the capital account of each of the partners. Upon purchase in 1957 of the property which became the site of the company's *157 new office building, title was taken in the name of the partnership. Gift tax returns reporting the gift to each of the four trusts of a one-fifth interest in the assets and liabilities of the sole proprietorship were filed on behalf of the petitioners. The gift tax returns reflected the amounts shown in the schedule attached to both the trust instruments and the partnership agreement as set out hereinbefore. E. W. Cragin, one of the original cotrustees of the trusts, had a number of business interests in Las Vegas, including a partnership interest in an insurance brokerage firm. Cragin was familiar with the construction business in general through his experience as agent for bonding companies. His firm represented the bonding company which provided bid and performance bonds for the partnership and prior thereto for the sole proprietorship here involved. Through bond placement, his firm realized commissions from the partnership, but this business was not substantial in comparison to the over-all business of the firm. Cragin had a personal net worth of between $400,000 and $600,000. He was a former mayor of Las Vegas; was highly respected in the community; and was not a person who *158 would be amenable to the will of others. Don R. Beagle was appointed as the other contrustee for each of the trusts. He was initially employed by petitioner in December 1952 when the business was conducted in proprietorship form, and has continued to be employed by the partnership up to the present time. Beagle's duties upon his initial employment were primarily clerical in nature. He advanced rapidly in the business and in a few years was handling some of the most important operations in the business. Upon becoming trustee he was given more responsibility in the operation of the business. After his appointment as trustee the signature cards at the bank were changed and Beagle was authorized to sign checks on the partnership account. Since that time he has signed most of the checks. He was also authorized to sign, and has signed, bids, bonds, contracts, and other documents pertinent to the business. Beagle is familiar with all facets of the business and has participated in estimation work, bid preparation and submission, preparation of subcontracts and contracts, and has supervised the bookkeeping and office work. Beagle's salary, while working for the taxpayer, was as follows: Year
Salary
1953
$ 4,000 - $4,200
1954
4,089
1955
4,350
1956
7,550
1957
7,875
1958
11,500
1959
10,707
1960
12,180
Upon *159 the death of E. W. Cragin in 1959, Abe P. Miller, in conformance with the trust agreements, was appointed successor contrustee by the district judge of Department No. 1 of the Eighth Judicial Court, District Court of the State of Nevada, in and for the County of Clark. Miller was one of three persons considered as successor trustee. He was independent of the petitioner. Petitioner originally considered appointment of a corporate trustee, but decided against such appointment because he considered a corporate trustee cold, impersonal, and cumbersome in the type of business carried on by the partnership. Beagle was selected as cotrustee because of his understanding of the business and because he was young, energetic, and honest. Cragin was selected because of his business experience and judgment. The trustees were consulted on business matters apart from routine or day-to-day matters and participated in all the major policy decisions affecting the business. The trustees were regularly advised of the financial condition of the business and received copies of annual financial statements. They participated in discussions of the jobs currently under construction by the company, future contract *160 opportunities, progress and capital requirements of the company. They also participated in decisions determining matters such as the salary and bonus of the managing partner, whether earnings should be retained for the needs of the business or distributed to the partners, and whether the company should expand its business operations. A separate capital account was set up on the partnership books for each of the trusts. The books maintained by the J. A. Tiberti Construction Company showed capital accounts, distributive shares of earnings, the drawings and the balances in the accounts for each of the trusts and for the petitioner. While separate ledger sheets were maintained for each of the trusts reflecting distributions and balances, a separate set of books for the trusts was not maintained until cash distributions were made to the trusts in 1960. After such cash distributions a separate set of books was maintained for the trusts. Partnership returns were filed annually on behalf of the partnership and fiduciary returns reflecting partnership income were filed annually on behalf of each of the trusts. A certificate of doing business under the fictitious name of J. A. *161 Tiberti Construction Company was executed and notarized on January 3, 1955, and filed with the Clerk of Clark County, Nevada, on April 25, 1955. The certificate set forth the names of the petitioner, the cotrustees, and the trusts as the persons composing the firm doing business under that name. Annual financial statements for the company were filed with the National Bank of Nevada and such statements set forth that the business was being conducted in the form of a partnership with the trusts and trustees as partners. Annual financial statements setting forth the partnership arrangement also were filed with the bonding company. Royal required Cragin and Beagle, in their capacity as trustees, to sign indemnity agreements with the bonding company. Notice of the formation of the partnership and the identity of the partners was given to Dun & Bradstreet, which published reports reflecting this information and the change in form of doing business from sole proprietorship to partnership. On construction jobs which the company performed for the Corps of Engineers the company was required to submit copies of the partnership agreement and the trust agreements to the Corps of Engineers. Bids *162 submitted to the Atomic Energy Commission by the company set forth the existence of the partnership and the identity of the partners. The State Contractor's Board, which issues licenses to contractors, was notified of the formation of the partnership, as was the county school district. On two occasions, creditors have brought suit against the company on disputed matters, and the complaints filed therein have set forth the existence of the partnership. The existence of the partnership was made known to the public and to persons doing business with the company. The major portion of the construction work performed by the company has been under contract with agencies of Federal, state, city, and county governments. On all such work of a public nature, and on most private contracts performed by the company, it is necessary to furnish bid and performance bonds in order to bid or be awarded such contracts. In the general contracting business in which the partnership was engaged, the bonding capacity of the company determines the volume of work that can be performed and the specific construction jobs which can be bid by the company. One of the most important factors considered in determining *163 the bonding capacity of the company is the liquid capital position which it maintains. A rule of thumb used by bonding companies is that a contractor must maintain capital in readily negotiable form equal to at least 10 percent of the contractor's total work on hand. On both public and private contract work performed by the company, the governmental agency or owner retains 10 percent of payments due under the contract until the work has been completely performed and accepted. The partnership performs the concrete, carpentry, and millwork portions of construction contracts, and subcontracts between 60 percent and 70 percent of the work, a normal percentage in the industry. While the subcontracts provide that the company may retain 10 percent of amounts due subcontractors until completion and acceptance of the job, it is necessary in many cases for the company to pay its subcontractors currently without retention despite the fact that amounts due the company as prime contractor are subject to retention. It is necessary for the company to pay monthly for materials used on the jobs and to meet weekly payrolls of its own labor force engaged on the portions of the prime contracts performed *164 by the company and not subcontracted. In addition, the construction business is such that the maintenance of liquid capital reserves to meet emergency conditions is essential. Capital is a vital factor in producing income in the business in which the company was engaged. In the early period of the partnership the company's capital position and bonding capacity were limited so that the company was unable to bond and bid large-scale contracts submitted for competitive bidding. By virtue of retaining earnings in the business the company has increased its capital position and bonding capacity so as to enable it to bond, bid, and perform similar large-scale contracts. Due to retention of earnings the company has increased its liquid capital position so that its bonding capacity has increased over the period 1955 to 1961 from approximately $1,000,000 in 1955 to approximately $6,000,000 in 1961, making possible a proportionate increase in the volume of work which can be performed by the company. In 1958 the company was able to secure a bond and therefore able to bid on the contract for the Clark County Courthouse with a contract price exceeding $3,000,000. The company did not have the capital *165 to bid a job of that magnitude in 1955, 1956, or 1957. Annual distributions of earnings to the partners would have limited the volume of work which it could perform; might have prevented the company from entering into or performing large construction contracts; and could have prevented the company from withstanding emergency situations that arose in the course of its operations. Tiberti indicated to a representative of the bonding company that withdrawals by the trusts would not be substantial. During the years 1955 to 1960 Tiberti received the following salaries: Year
Salary
1955
$15,000
1956
15,000
1957
25,000
1958
15,000
1959
30,000
1960
30,000 The decisions as to basic salary of the managing partner, and whether or not business warranted additional salary or bonuses, were made by all of the partners and were based upon services performed by the petitioner and the volume and profits of the business. The payment of a base amount of salary with additional amounts, if any, dependent upon volume and profits is a normal method of compensating managers in the industry. The amounts allocated to petitioner as salary were comparable to compensation paid for the performance of similar services in that *166 area in the industry. The following withdrawals were made by Tiberti from the J. A. Tiberti Construction Company: 1955
1956
1957
1958
1959
$ 3,000.00
$ 1,105.15
$ 5,801.08
$14,716.77
$14,807.35
19,882.68
2,250.00
12,430.08
10,000.00
2,500.00
2,250.00
6,953.66
2,500.00
2,250.00
2,646.45
8,795.84
2,000.00
6,477.73
25,946.82
5,451.25
$36,678.52
$47,730.95
$18,231.16
$34,316.88
$14,807.35 Salary and capital distributions were credited to Tiberti's account at the end of each year. The partnership was indebted to petitioner at the end of 1955 in the amount of $7,664.67. Petitioner was indebted to the partnership at the end of 1956 and 1957 in the respective amounts of $18,719.49 and $34,981.18. These latter amounts were reflected on the books and partnership returns as receivables due from the petitioner. At all times the liability of petitioner to the partnership was substantially less than the balance of his capital account. This liability was reduced in each of the years 1958, 1959, and 1960. Petitioner borrowed from the partnership to purchase land and construct a residence to replace the small tract house in which the family lived at that time. Prior to such withdrawals petitioner consulted the trustee partners, *167 who agreed that the family needs required a new residence and to the borrowing of such amounts from the partnership rather than from the bank. No interest was paid by Tiberti on the loans. Distributions from capital accounts were made equally to each of the partners, and the balance in each partner's capital account was equal at the end of each partnership year. During the years in issue distributions were made to the trusts for the purpose of paying income taxes. In 1960 a $5,000 cash distribution was made to each of the four trusts. These amounts were deposited in savings accounts for the trusts, and the passbooks are in the possession of the trustee. Trust assets were never used for the support of petitioners' children. Cash distributions were not made to the trusts in other years because of the capital requirements of the business. Opinion Petitioners created four trusts for their minor children. Under trust agreements dated January 1, 1955, each of the trusts received a one-fifth interest in the assets of Tiberti's construction business, theretofore operated as a sole proprietorship. The remaining one-fifth interest was retained by Tiberti. All of the assets were contributed to *168 a partnership which thereafter operated the business. The sole question for our determination is whether trusts created by petitioners for their minor children owned capital interests in a bona fide partnership in which capital was a material income-producing factor so that distributable shares of partnership income were properly includible in the gross income of each of four trusts. Section 704(e)(1) and ( 2), Internal Revenue Code of 1954, provides as follows: SEC. 704. PARTNER'S DISTRIBUTIVE SHARE. * * *
(e) Family Partnerships. - (1) Recognition of Interest Created by Purchase or Gift. - A person shall be recognized as a partner for purposes of this subtitle if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person. (2) Distributive Share of Donee Includible in Gross Income. - In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered *169 to the partnership by the donor, and except to the extent that the portion of such share attributable to donated capital is proportionately greater than the share of the donor attributable to the donor's capital. The distributive share of a partner in the earnings of the partnership shall not be diminished because of absence due to military service. Paragraphs (1) and (2) of section 704(e) were enacted as a part of the Revenue Act of 1951. Section 340(a), Revenue Act of 1951, amended section 3797(a)(2), Internal Revenue Code of 1939, by adding thereto the following sentence: A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person. Section 340(b), Revenue Act of 1951, amended supplement F of chapter 1 by adding at the end thereof a new section, in part, as follows: SEC. 191. FAMILY PARTNERSHIPS. In the case of any partnership interest created by gift, the distributive share of the donee under the partnership agreement shall be includible in his gross income, * * *. This legislation was enacted *170 to make it clear that "where there is a real transfer of ownership, a gift of a family partnership interest is to be respected for tax purposes without regard to the motives which actuated the transfer." [1] Accordingly, our inquiry is directed to the question whether there was in the instant case a completed gift of income-producing property effective to shift to the donees the tax incidence of the income thereafter derived from the property. Cf. Blair v. Commissioner, 300 U.S. 5. As the regulations indicate, where there is a family relationship close scrutiny must be given the facts of the case to make sure that dominion and control of the partnership interests actually are fixed in the transferees. [2] *171 We have examined carefully the trust and partnership agreements, the actions of the trustees here involved, the representations made to people with whom the purported partnership did business, and the purported partnership's record of earnings accumulation and distribution. The trust and partnership instruments are set out in full in the findings of fact. Under the agreements, Tiberti, as the managing partner, retained wide powers to operate the business, including discretion to retain profits. The trust instruments provide that the managing partner's decisions regarding the retention of earnings are to be respected only "so long as * * * [the trustees] deem it in the best interest of the trust, * * *" but contain the further provision that "In the event any conflict arises between the duties imposed by law upon the Trustees in their capacities as Trustees, and the duties imposed by law or otherwise upon the Trustees in their capacities as Managers of the business, the latter shall control." Of themselves, however, these and other provisions giving Tiberti extensive authority are not conclusive, for partnership affairs frequently are conducted by a managing partner who has such authority. Theodore D. Stern, 15 T.C. 521. Very similar provisions were employed in Henry S. Reddig, 30 T.C. 1382, relied *172 upon by respondent, wherein this Court held the partnership was not to be recognized for income tax purposes. There are significant differences between Reddig and the instant controversy, however. For example, while a withdrawing partner in either case would receive only the book value of his capital account without allowance for intangibles unless there were a termination of the partnership, the trustees could force termination of the partnership in the instant case, whereas the grantors alone had sufficient control to do so in Reddig. In Reddig, moreover, withdrawals of funds by the grantors exceeded their capital accounts. Tiberti never withdrew amounts in excess of his capital account. Any withdrawals by him in excess of salary and regular partnership distributions were treated as amounts due the partnership and were repaid by Tiberti year by year in whole or in part. While Tiberti controlled the day-to-day management of the business, it appears from all of the facts that the trustees actively pursued their fiduciary obligations and took part in the making of significant decisions with respect to the partnership. A contrary conclusion was reached in Reddig. Don R. Beagle had *173 been employed by Tiberti for about two or three years when he became a trustee. He continued in the employ of the partnership. Undoubtedly he was responsible to Tiberti for his job, his promotions, and his salary. Nevertheless, he was familiar with the business; his actions as trustee reflected his best judgment asserted in a constructive fashion; and we do not find that he was subject to Tiberti's will. E. W. Cragin was the other contrustee until his death. His successor was appointed by a Nevada District Court. Cragin was a man of substantial means and business experience. Although he received commissions from Tiberti and the partnership as the result of his acting as agent for a bonding company, he was not, in fact, amenable to petitioner's control. We are satisfied that the trustees acted with independent judgment in their participation in the business. They are not to be regarded as mere tools of the petitioner. Thus, unlike Reddig, the power in the trustees to make payments to persons with whom the beneficiaries reside does not destroy the bona fides of the gifts or partnership arrangement. [3]
Respondent's suggestion that continued *174 investment of all of the trust assets in the construction business is evidence that the trustees were subject to control by Tiberti is without merit. While the business had an element of risk, it was profitable. The trustees watched it carefully, successfully advising Tiberti against certain projects they considered unwise. Similarly, their agreement to the retention of earnings by the partnership was based not on subjection to Tiberti's will but on the fact that retained earnings were essential to the growth of the business. All of the evidence detailed in our findings of fact indicates that the existence of the partnership was widely known and that third parties took cognizance of the partnership in their dealings with it. Even if petitioners' primary purpose in creating the trusts and forming the partnership was to reduce their taxes - a finding which we do not make - that purpose would not, in the face of a bona fide gift, make the entire income of the partnership taxable to them. [4] *175 To be recognized as partners, the trusts must own a capital interest in a partnership in which capital is a material income-producing factor. [5] Respondent argues that capital was not a material income-producing factor in the business and that the success of the business is attributable almost entirely to the efforts of Tiberti. Tiberti. Tiberti did play the principal role in operating the company. Perhaps his efforts were indispensable to its continued success. Nevertheless, as the Regulations indicate, "the determination as to whether capital is a material income-producing factor must be made by reference to all the facts of each case." [6]
The record amply demonstrates that this company was engaged primarily in bidding and operating as a general contractor on local, county, state, and Federal projects. In order to bid on such contracts, a construction company must have both "bid" and "performance" bonds. Its ability to bid on a contract is directly dependent upon the size of the bond which it is able to obtain. In order to *176 increase its bonding capacity, and thereby be able to bid on larger jobs, the company retained earnings. By virtue of retained earnings, the bonding capacity increased over the period 1955 to 1961 from about $1,000,000 in 1955 to approximately $6,000,000 in 1961. A rule of thumb used by bonding companies is that a contractor must maintain capital in readily negotiable form equal to at least 10 percent of the contractor's total work on hand. Moreover, it appears that a general contractor often has 10 percent of the amounts due it retained by the party letting the contract, whereas the general contractor often must make payments, without any comparable retention, to subcontractors who have a weaker capital position; and, almost inevitably, a contractor must be in a position to survive emergency situations and to make weekly payments for labor and supplies, regardless of payments received. For all of these reasons, we think it is abundantly clear that capital was a material income-producing factor in this business. Cf. Walberg v. Smyth, 142 F. Supp. 293 (N.D. Cal., 1956). Respondent argues that even if the gifts were complete and capital was a material income-producing factor, the amount *177 of the gifts is limited by the values set out in the balance sheet attached to the trust and partnership agreements and disclosed in the gift tax return filed by petitioners. We cannot agree. The trust instruments provide for assignment to each child of a one-fifth interest in the business assets, and we are convinced that petitioners' intention was to convey a one-fifth interest in the entire business to each trust. Values assigned the assets on the gift tax return are not material herein. Nor do we find any reason to adjust the amounts includible in the incomes of the trusts by reason of salaries paid to Tiberti. Section 704(e)(2) provides that "the distributive share of the donee under the partnership agreement shall be includible in his gross income, except to the extent that such share is determined without allowance of reasonable compensation for services rendered to the partnership by the donor, * * *." The partnership agreement provided that Tiberti was to receive a salary of $15,000 per year. In fact, he received more than that in some years when, on the basis of his services and of the profits of the business, all of the partners deemed a greater amount appropriate. Tiberti's *178 salary was comparable to salaries paid persons in similar positions in other companies in the same business in the Las Vegas area. We find that the trusts created by petitioners for their minor children owned capital interests in a bona fide partnership in which capital was a material income-producing factor, and hold that the distributable shares of partnership income were properly includible in the gross incomes of the trusts. Jack Smith, 32 T.C. 1261; Thomas H. Brodhead, 18 T.C. 726, affd. 210 F. 2d 652 (C.A. 9, 1954). Decision will be entered for the petitioners. Footnotes
*. Amount held back for Tiberti's 1954 tax liability.↩
1. H. Rept. 586, 82d Cong., 1st Sess., pp. 32, 33-34 (1951), 1951-2 C.B. 357↩, 380-381.
2. Sec. 1.704-1(e)(1)(iii), Income Tax Regs.
Section 1.704(e)(1)(i) through (iv) set out the applicable regulations with respect to recognition of the donee as a partner, requirement of capital transfer to the donee, and the necessity that capital be a material income-producing factor.
3. See section 1.704-1(e)(2)(vii), Income Tax Regs.↩
4. See footnote 2. In fact, it does not appear that tax considerations motivated the transactions. Tiberti was one of nine children and had been taken into his father's business as a boy. He testified that he wished to make a similar arrangement for his own children.
5. Section 704(e)(1), Internal Revenue Code of 1954↩. 6. Section 1.704-1(e)(1)(iv), Income Tax Regs.↩